IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARTIN YOUNG,**                                    Case No. 1:16 CV 1372

    Plaintiff,

    v.                                             Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                    MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Martin Young ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI") and disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73 (Doc. 13). For the reasons stated below, the undersigned reverses the Commissioner's decision and remands for further proceedings consistent with this opinion.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI and DIB in January 2014, alleging a disability onset date of September 13, 2013. (Tr. 147-54). His claims were denied initially and upon reconsideration. (Tr. 93-99, 108-19). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 120). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before

the ALJ on November 9, 2015. (Tr. 31-45). On January 7, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 17-25). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff filed the instant action on June 7, 2016. (Doc. 1).

FACTUAL BACKGROUND[1]

*Personal Background and Testimony*

Plaintiff was 54 years old at the time of the hearing. (Tr. 34). He had completed high school, and "[a]lmost a full year of college" plus "some vocational training" in broadcasting. *Id.* He had previously worked as a security guard and a stagehand for House of Blues. *Id.* The job consisted of "security", "basically crowd control", and "setting up the club." *Id.* He explained the stagehand work consisted of "loading, unloading trucks" and "a lot of warehouse work" with "[a] lot of on-the-feet, a lot of lifting." *Id.*

When asked why he selected September 13, 2013 as his onset of disability date, Plaintiff replied: "[W]ell, that was the day I was terminated from the House of Blues" and "the problems had started a little bit before that." *Id.* Plaintiff stated he was fired for not showing up for work, but contends his schedule had been changed without his knowledge. (Tr. 35).

On a typical day, Plaintiff takes care of his 81 year old mother, "making sure she has what she needs, if there's any shopping or anything, and making sure she's all right." *Id.* This includes

---

1. Plaintiff's challenges are primarily directed at the ALJ's consideration of his back and knee pain. Plaintiff has waived argument on issues not raised in his opening brief. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). The Court will therefore summarize the facts relevant to those arguments raised by Plaintiff.

"a lot of running around for her, help with . . . doing laundry, cooking, cleaning, stuff like that." (Tr. 36). Plaintiff also testified he could perform these same tasks for himself. (Tr. 41).

Plaintiff testified that he has pain in his lower back, which shoots into his legs equally. (Tr. 37). He also experiences pain in his left knee, and neuropathy in both feet. (Tr. 37-38). The pain is worsened by being on his feet. (Tr. 38). Plaintiff testified that his pain at the time of the hearing was "about a six" and that he was taking Vicodin twice a day for the pain. (Tr. 36). He did not experience any side effects from the Vicodin. (Tr. 40).

Doctors had discussed knee surgery with Plaintiff, but wanted to wait until he was older. (Tr. 39). He had received injections in his back, which provided relief for four to six months each time (though they were supposed to provide relief for a year). (Tr. 39-40). Plaintiff also had a TENS unit, and had undergone physical therapy. (Tr. 40).

Plaintiff estimated he could stand for "[m]aybe 45 minutes" before having to sit down. (Tr. 38). He would then have to rest for 10-15 minutes before standing again. *Id.* He testified he walks with a limp, and keeps a brace on his knee. *Id.* He estimated he could walk about one-eighth of a mile, and then would have to "stop, catch [his] breath, and relax for a second, and then [he could] move on." (Tr. 38-39).

Plaintiff reported he saw Dr. Sieben approximately once every three months, and had been seeing her for almost three years total. (Tr. 36).

***Relevant Medical Evidence***

*Prior to Alleged Onset Date*

Plaintiff underwent physical therapy due to his back pain in January 2013 and earlier. (Tr. 530-32) (notes from sixth physical therapy visit). The physical therapy notes reference imaging

from October 2012 that showed "[m]oderate degenerative disease of the thoracic and lumbar spine with some worsening when compared to the prior study." (Tr. 530).

At a February 2013 visit with Zachary Allred, D.O., at MetroHealth Medical Center Department of Physical Medicine and Rehabilitation, Plaintiff reported low back pain which he had for over four years. (Tr. 547). He was taking Vicodin for the pain. *Id.* He described his pain as localized in his central lower back with some radiation to the back of both knees. (Tr. 548). Plaintiff also reported he was using a TENS unit at work, which cut his pain in half, and he was "better able to stand for longer periods of time." *Id.* He had been through physical therapy, and was doing a home exercise program twice per week. *Id.* At this visit, Plaintiff also reported left knee pain, worse with stairs. *Id.* Plaintiff had been to the ER the previous week with back pain and a suspected kidney stone, but "was able to go back to work on the Tuesday after the ER visit." (Tr. 547). Notes indicate Plaintiff was working full-time as a security guard. (Tr. 549). Notes from this visit also summarized lumbar spine x-rays, with an impression of "[m]oderate degenerative disease of the thoracic and lumbar spine with some worsening when compared to the prior study." (Tr. 550).

An April 2013 note states that Plaintiff was encouraged to "decrease use of Vicodin" but that "this does not seem to be the pattern that he is following." (Tr. 558).

In May 2013, Plaintiff completed a pain management self evaluation. (Tr. 632-37). He reported he worked in security at House of Blues and had not missed any work in the past three months due to his symptoms. (Tr. 632). He also indicated he was not currently applying for disability. *Id.*

In June 2013, Plaintiff saw Kutalba Tabbaa, M.D., to establish care for his back pain. (Tr. 628-31). Plaintiff reported pain in his right lower back and down the right leg occasionally for four

years. (Tr. 630). Dr. Tabbaa found some limitation of motion (mild in flexion, marked in extension and rotation), with tenderness to palpation over the paraspinal muscles. (Tr. 629).

Plaintiff went to the emergency room in June 2013 for left knee pain. (Tr. 608-12). In July 2013, Plaintiff followed up with Charlotte Wagamon, M.D., at MetroHealth Orthopaedics. (Tr. 349). Plaintiff reported he had difficulty extending his knee, had anterior pain, and the pain was worse with stairs and walking. *Id.* Dr. Wagamon's examination revealed tenderness and slight effusion, but a normal gait and negative Lachman's and McMurray's testing. *Id.* She assessed osteoarthritis and Plaintiff received a steroid injection in his left knee *Id.* During this visit, Plaintiff also reported chronic back pain for which he took Vicodin. *Id.* The notes also indicate Plaintiff told Dr. Wagamon that his pain management physician would no longer prescribe the Vicodin due to a positive drug screen test for marijuana. *Id.*

In July 2013, Plaintiff saw internal medicine physician Louise Sieben, M.D., at MetroHealth to establish care. (Tr. 343) ("new patient to me, transfer of care from Brooklyn office"). Plaintiff reported his knee was somewhat better after the injection, but that he continued to have lower back pain. *Id.* A knee x-ray showed "[m]oderately severe tricompartmental degenerative changes . . . with joint space narrowing and bony spurring." (Tr. 352). He reported working 30 hours per week as a security guard, and that he "does well as long as he does not need to stand for long periods of time". *Id.* "Walking up and down steps [was] also a problem." *Id.* Under "Assessment/Plan", Dr. Sieben noted, among other things, "Vicodin refill. Return in 2 months and as needed." (Tr. 344).

Also in July 2013, Dr. Tabbaa performed a bilateral L3, L4, and L5 lumbar medial branch block on Plaintiff due to lumbosacral spondylosis and chronic lower back pain. (Tr. 331). Notes

indicated that a "[p]hysical exam and [r]adiological findings correlate with the preoperative diagnoses", which included lumbosacral spondylosis and chronic lower back pain. *Id.*

Later that same month, Plaintiff returned to Dr. Sieben. (Tr. 325). Her notes indicate Plaintiff "need[ed] clarification of restrictions for his job." *Id.* She noted Plaintiff "is able to stand for long periods of time as long as he can move around and lean on something", "can sit for up to several hours at a time with breaks", and "can walk up or down 6 steps at a time, but not complete flights of stairs." *Id.* Dr. Sieben also noted Plaintiff "continues his care with Dr. Tabbaa in pain management for his back pain." *Id.* In the "Physical Exam" section of her notes, Dr. Sieben noted "Gait: walks leaning forward, small steps." *Id.* She assessed chronic lower back pain, instructed Plaintiff to "continue care at 3 pain management", and noted she wrote a letter "with clarification of restrictions for his employment." (Tr. 325-26). She continued to prescribe Vicodin. (Tr. 326).

*After Alleged Onset Date*

In October 2013, Plaintiff saw Dr. Sieben for diabetes management. (Tr. 284-85). At that visit, Dr. Sieben also cited Plaintiff's diagnosis of lumbosacral spondylosis and noted "pain clinic referral for evaluation and management". (Tr. 285).

In November 2013, Plaintiff underwent his second bilateral L3, L4, and L5 medial branch block with Dr. Tabbaa. (Tr. 779). Plaintiff reported the first block had provided him relief for a month and a half. (Tr. 780).

At a December 2013 cardiology appointment, the physician noted Plaintiff "recently lost his job as a security man and feels sad and depressed – working a second job that pays very little." (Tr. 268).

In January 2014, Plaintiff underwent a right L3, L4, L5 and S1 lesion mode—lumbar medial branch radiofrequency rhizotomy with Dr. Tabbaa. (Tr. 831). Dr. Tabbaa noted Plaintiff's

6

previous medial branch blocks had "lasted for 1-2 months." *Id.* Having received some relief from the right side ("RT side was done 2 weeks ago and feeling better"), Plaintiff underwent the same procedure on the left. (Tr. 887).

Also in January 2014, Plaintiff saw Dr. Sieben for diabetes management. (Tr. 241-42).

A radiology report from March 2014 showed no acute bony abnormality or compression deformity or fracture in Plaintiff's lumbar spine. (Tr. 362). It also revealed "marked degenerative change with vacuum disk phenomenon and moderate anterior osteophytic spurring at all and "fairly marked facet joint hypertrophy at L4-5 and L5-S1." *Id.*

In April and May 2014, Plaintiff again saw Dr. Sieben. (Tr. 376-79, 453-54). Notes in May 2014 indicate Plaintiff visited "for disability paperwork." (Tr. 377). Dr. Sieben's notes from this visit address Plaintiff's insurance coverage, and management of his diabetes. *Id.*

In July 2014, Plaintiff returned to Dr. Sieben. (Tr. 408). He reported his back pain had returned and requested a referral back to Dr. Tabbaa. *Id.* Dr. Sieben noted Plaintiff reported he had "very good relief from [the] procedure in January." *Id.* Dr. Sieben assessed, among other things, lumbosacral spondylosis and noted she would refer Plaintiff to the pain clinic. (Tr. 409).

In August 2014, Plaintiff again underwent bilateral rhizotomy treatments. (Tr. 417, 429). He had the left side done first (Tr. 417), and when he reported ten days later for the right side, Dr. Tabbaa noted "[l]eft side is feeling great" (Tr. 429).

At a September 2014 follow up appointment, Dr. Tabbaa noted Plaintiff's lumbar and hip pain were "stable", and that Plaintiff descried his current pain as "sharp, crampy, burning and . . . made worse by rotation and standing." (Tr. 444). Dr. Tabbaa also noted the rhizotomy procedures were helping. *Id.* On examination, Dr. Tabbaa found tenderness to palpation over paraspinal muscles, but normal strength, reflexes, and sensation in all extremities. (Tr. 445-46).

At a cardiology appointment in November 2014, the physician noted Plaintiff was "currently busy taking care of his mother who had fallen in July." (Tr. 461).

In January 2015, Plaintiff again saw Dr. Sieben for diabetes management. (Tr. 493-94).

In April 2015, Plaintiff saw internal medicine physician Christopher Suntala, M.D., for follow up of his back pain. (Tr. 506-09). Dr. Suntala noted Plaintiff complained of back pain and dental pain. (Tr. 506). Plaintiff was working "as a bouncer at a nightclub in Lakewood." *Id.* On examination, Dr. Suntala noted back pain, but normal range of motion and no tenderness. (Tr. 509).

In July 2015, Plaintiff returned to Dr. Suntala. (Tr. 974-79). Dr. Suntala noted Plaintiff was "limited by back pain and lumbar radicular pain and osteoarthritic pain in both knees." (Tr. 974). Dr. Suntala also noted Plaintiff's "diabetes has been well-controlled, and his cardiac symptoms are stable." (Tr. 974-75). On examination, Dr. Suntala found a positive straight leg raising test, but no tenderness. (Tr. 977).

*Opinion Evidence*

In March 2014, Plaintiff underwent a consultative internal medicine examination by Khalid Darr, M.D., of Tri-State Occupational Medicine, Inc. (Tr. 364-71). Plaintiff reported low back pain over the prior five years. (Tr. 364). Dr. Darr observed Plaintiff ambulated with a normal gait, and did not require the use of a handheld assistive devise. (Tr. 365). He was "stable at station and comfortable in the supine and sitting positions." *Id.* His lower extremities did not show tenderness, swelling, or crepitus. (Tr. 366). Plaintiff had a slightly reduced range of motion in his knees (130 degrees as compared to a normal 150 degrees). (Tr. 371). Plaintiff had no tenderness in his cervical or dorsolumbar spine, and his straight leg test in the sitting and supine position was normal. (Tr. 367). Plaintiff had full strength in his upper and lower extremities, with no evidence of atrophy.

*Id.* He was able to walk on his heels and toes, perform tandem gait, and squat "without difficulty." *Id.* Dr. Darr's impression was "low back pain, probably degenerative disc disease." *Id.* Functionally, Dr. Darr concluded Plaintiff could "sit, stand, carry and lift between 30 to 50 pounds frequently, and over 60 pounds occasionally". *Id.* He also concluded Plaintiff had no limitations in reaching, handling, or fine and gross movements. *Id.* He could push and pull, as well as manipulate objects. *Id.* He was "able to drive a motor vehicle without any difficulty" and could climb stairs. *Id.*

Later in March 2014, state agency reviewing physician Maria Congbalay, M.D., reviewed Plaintiff's records and assessed his functional capacity. (Tr. 50-52). She concluded Plaintiff could: 1) occasionally lift or carry 20 pounds; 2) frequently lift or carry 10 pounds; 3) stand and/or walk about six hours in an eight hour workday; 4) sit about six hours in an eight hour workday; and 5) push and or pull in an unlimited capacity "other than shown, for lift and/or carry." (Tr. 51). Dr. Congbalay concluded Plaintiff would have some postural limitations due to his obesity, knee arthritis, back pain, and coronary artery disease, and could: 1) frequently climb ramps or stairs; 2) never climb ladders, ropes or scaffolds; 3) frequently balance, stoop, or kneel, and 4) occasionally crouch or crawl. *Id.* Finally, Dr. Congbalay concluded Plaintiff should avoid hazards such as machinery and heights due to his obesity and coronary artery disease. (Tr. 52).

In June 2014, state agency reviewing physician Diane Manos, M.D., reviewed Plaintiff's records and reached the same functional capacity conclusions as Dr. Congbalay. (Tr. 71-73).

In October 2014, Dr. Sieben completed a physical functional capacity assessment. (Tr. 980-81). In it, she noted Plaintiff could occasionally lift 30 pounds, and frequently lift 10 pounds. (Tr. 980). She concluded he could only stand or walk for fifteen minutes without interruption, and sit a total of four hours in an eight-hour workday (one hour uninterrupted). *Id.* Under the "medical

9

findings that support this assessment" for Plaintiff's lifting, carrying, standing, walking, and sitting restrictions, Dr. Sieben listed "sciatica" and "feet numbness". *Id.* She stated Plaintiff could rarely perform postural activities such as climbing, balancing, stooping, crouching, kneeling and crawling. *Id.* These restrictions were due to "diabetes with foot numbness", "knee derangement", and "sciatica". *Id.* She concluded Plaintiff could only occasionally reach, push/pull, and perform fine and gross manipulations due to sciatica. (Tr. 981). He had environmental restrictions regarding heights, moving machinery, and pulmonary irritants due to his diabetes with foot numbness and heart disease. *Id.* Dr. Sieben noted Plaintiff had been prescribed a cane, brace, and TENS unit, and would need to be able to alternate positions (sitting/standing/walking) at will. *Id.* Dr. Sieben noted Plaintiff experiences pain, and checked a box that such pain is "severe". *Id.* She thought such pain would interfere with Plaintiff's concentration, make him off task, and cause absenteeism. *Id.* The final question on the form asked Dr. Sieben to "identify any additional limitations that would interfere with work 8 hours a day, 5 days a week." *Id.* She responded: "heart disease, shortness of breath". *Id.*

### *VE Testimony*

A VE testified at the ALJ hearing. (Tr. 41-44). In his first hypothetical, the ALJ asked the VE to consider a person with Plaintiff's age, experience, past relevant work, and who could:

> [l]ift, carry 20 pounds occasionally, 10 pounds frequently. . . . [;] stand and walk a total of six out of eight hours a day . . . . [;] sit six out of eight . . . [;] frequently push, pull, and foot pe[d]al. . . . [;] frequently use a ramp or a stairs [sic] but never a ladder, rope, or a scaffold . . . . [; and] constantly balance, frequently stoop and kneel, but only occasionally crouch and crawl. No manipulative visual or communications deficits. This person should avoid entirely, dangerous machinery and unprotected heights.

(Tr. 42). The VE responded that such an individual could not perform past jobs "as [Plaintiff] did them", but could perform "a security guard job as it's normally done." (Tr. 41-42). The VE also

10

testified that such an individual could perform the jobs of wire worker, electronics worker, or assembly press operator. (Tr. 43).

Plaintiff's attorney asked the VE if a restriction allowing the person to "change positions from sitting and standing as needed outside of scheduled times" would change his answer. (Tr. 44). The VE testified that such a restriction would limit a person to sedentary, rather than light work. *Id.*

### ALJ Decision

In his written decision, the ALJ concluded Plaintiff met the insured status requirements of the Social Security Act through June 30, 2017. (Tr. 19). He concluded Plaintiff had not engaged in substantial gainful activity since his application date, and had severe impairments of "ischemic heart disease, osteoarthritis in the back and legs, discogenic and degenerative disorders of the back, diabetes mellitus and obesity." *Id.* He concluded these impairments did not meet or equal the listings (Tr. 20), and Plaintiff retained the RFC to perform:

> [l]ight work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can stand and walk for a total of six hours and sit for a total of six hours out of an eight-hour day. He can frequently push, pull and foot pedal and frequently use ramps and stairs, but never climb ladders, ropes or scaffolds. [He] can constantly balance and frequently stoop and kneel, but only occasionally crouch and crawl. He has no manipulative, visual or communications deficits. The claimant should entirely avoid dangerous machinery and unprotected heights.

(Tr. 21). Based on the VE's testimony, the ALJ then found Plaintiff was capable of performing past relevant work as a security guard. (Tr. 24). Alternatively (and based on the VE's testimony), the ALJ also found Plaintiff could perform other jobs in the national economy such as wire worker, assembly press operator, or electronics worker. (Tr. 24-25). Therefore, the ALJ concluded, Plaintiff was not disabled. (Tr. 25).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

4.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ: 1) failed to properly evaluate the opinion of his treating physician, Dr. Sieben; 2) and erred in evaluating his pain. (Doc. 15). The Commissioner responds that the ALJ provided good reasons for discounting Dr. Sieben's opinion, and substantial evidence supports the ALJ's credibility/symptom analysis finding. (Doc. 17).

### Treating Physician Rule

Plaintiff contends the ALJ erred in assigning little weight to the October 2015 physical residual functional capacity assessment completed by Dr. Sieben. (Doc. 15, at 8-12). The

13

Commissioner responds that the ALJ's decision is supported by substantial evidence. (Doc. 17, at 8-11).

This argument implicates the well-known treating physician rule. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if: (1) it is supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the

frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec*., 561 F.3d 646, 651 (6th Cir. 2009).

After discussing the record evidence, the ALJ addressed the opinion evidence, including that of Dr. Sieben. As to Dr. Sieben, the ALJ stated:

> Louise Sieben, M.D., completed an October 2015 questionnaire in which she stated that the claimant is able to lift up to 30 pounds occasionally and 10 pounds frequently and stand or walk for up to one-quarter hour and sit for up to one hour at one time and for a total of four hours [citing Tr. 981]. She states that the claimant can rarely perform most postural activities and needs to be able to alternate positions at will (8F:2). The claimant testified at the hearing that he met with Dr. Sieben and described his limitations as Dr. Sieben completed the form. Because Dr. Sieben's statement is based on the claimant's subjective responses rather than an independent functional assessment, it is given minimal weight.

(Tr. 23). The ALJ appears to be referring to the following exchange between the ALJ and Plaintiff at the hearing:

> **Q**     How often do you see Dr. [Sieben]?
> **A**     It's usually every three months.
> **Q**     How long have you been seeing her?
> **A**     I've been seeing her almost three years.
> **Q**     Did you take a document to her to get filled out?
> **A**     Yes, I did, for, for this.
> **Q**     Okay. And did you talk to her about what you could do and could not do?
> **A**     Yes, I did.
> **Q**     All right.

(Tr. 36-37). The undersigned agrees with Plaintiff that this reason advanced by the ALJ for discounting Dr. Sieben's opinion is not sufficient to satisfy the reason-giving requirement of the treating physician rule. "Good reasons" are reasons "sufficiently specific to make clear to any

15

subsequent reviewers the weight given to the treating physician's opinion *and the reasons for that weight*." *Wilson,* 378 F.3d at 544 (emphasis added). The undersigned finds the ALJ's interpretation of the exchange from the hearing unfounded. Although Plaintiff stated he talked to Dr. Sieben about what he could and could not do, he did not say that this was all Dr. Sieben considered, Tr. 36-37, nor did Dr. Sieben's opinion indicate that the limitations listed were based solely on Plaintiff's subjective complaints, Tr. 980-81.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error." This occurs when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 547 (6th Cir. 2004); *see also Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011). In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Friend v. Comm'r of Soc. Sec.,* 375 F. App'x 543, 551 (6th Cir. 2010); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 F. App'x 456, 464 (6th Cir. 2005). "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 F. App'x at 551.

16

Here, because the Commissioner does not acknowledge the ALJ's error, she also does not argue such error could be harmless. In this case, the only reason given by the ALJ for rejecting Dr. Sieben's opinion is not supported by the evidence. The reasons the Commissioner advances for discounting Dr. Sieben's opinion—the opinion was not well supported, the opinion was inconsistent with the record evidence, and that Dr. Sieben primarily treated Plaintiff for other issues unrelated to his back and knee complaints—may very well be good reasons and have the support of substantial evidence. *See, e.g.*, Tr. 284-85 (October 2013 treatment primarily for diabetes management, but including a referral to pain clinic for back pain); Tr. 241-42 (January 2014 treatment only for diabetes management, with no mention of back problems); Tr. 381-86 (April 2014 treatment only for diabetes management and hypertension, with no mention of back problems); Tr. 376-80 (May 2014 visit for diabetes management with no mention of back problems); Tr. 453-54 (October 2014 visit primarily for diabetes management, with no mention of back problems). But these are not the reasons advanced by the ALJ, and are, rather, a post-hoc justification for the ALJ's conclusion. As such, remand is required because any analysis provided

by this Court would be improper post-hoc rationalization.[2] *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196

---

2. Plaintiff asks the court to remand the case "with instructions to give deference to Dr. Sieben's treating physician opinions." (Doc. 15, at 12). It is, however, the role of the ALJ to evaluate the evidence in the first instance, weigh any inconsistencies and be the finder of fact. *See, e.g., Bradley v. Sec'y of Health & Hum. Servs.*, 862 F.2d 1224, 1227-28 (6th Cir. 1998). Therefore, the undersigned declines the invitation to instruct the ALJ to give deference. Rather, the undersigned remands for a more complete analysis of the reasons for the weight given to Dr. Sieben's opinion.

(1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency); *see also Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) ("The treating physician rule requires an explanation by the SSA, not the court.").

Although the ALJ certainly discussed contrary record evidence, the ALJ's opinion does not "permit[] the claimant and a reviewing court a clear understanding of the reasons for the weight given [the] treating physician's opinion" and thus "strict compliance with the rule" should not "be excused" here. *Friend*, 375 F. App'x at 551; *see also Cole*, 661 F.3d at 939 (Sixth Circuit "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned") (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted). The ALJ may well reach the same conclusion on remand, but in so doing, Plaintiff "will then be able to understand the Commissioner's rationale and the procedure through which the decision was reached." *Cole*, 661 F.3d at 940. The undersigned therefore remands this case to allow the ALJ to more fully explain his reasoning for the weight given to Dr. Sieben's opinion.

### *Credibility / Pain Analysis*

Second, Plaintiff argues the ALJ failed to properly evaluate his claims of pain. (Doc. 15, at 12-15). The Commissioner responds that the ALJ provided the proper analysis and substantial evidence supports the ALJ's finding. (Doc. 17, at 11-15).

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment,

may be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th

Cir. 1984); *see also Grecol v. Halter*, 46 F. App'x 773, 775 (6th Cir. 2002). As the relevant Social

Security regulations make clear, however, a claimant's "statements about [his] pain or other

symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)); *Hash*

*v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Instead, a claimant's assertions of

disabling pain and limitation are evaluated under the following standard:

> First, we examine whether there is objective medical evidence of an underlying
> medical condition. If there is, we then examine: (1) whether objective medical
> evidence confirms the severity of the alleged pain arising from the condition; or (2)
> whether the objectively established medical condition is of such a severity that it
> can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). In determining whether a claimant has disabling pain,

the regulations require an ALJ to consider certain factors including: 1) daily activities; 2) location,

duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors;

4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than

medication, to relieve pain, 6) any measures used to relieve pain, and 7) other factors concerning

functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c);

SSR 16-3p, 2016 WL 1119029, at *7 ("[i]n addition to using all of the evidence to evaluate the

intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors

set forth in 20 CFR 404.1529(c)(3) . . . ."); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR

404.1529(c) . . . describe[s] the kinds of evidence, including the factors below, that the adjudicator

must consider in addition to the objective medical evidence when assessing the credibility of an

individual's statements").[3] Although the ALJ must "consider" the listed factors, there is no

requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287

(6th Cir. 2009); *Roberts v. Astrue*, 2010 WL 2342492, at *11 (N.D. Ohio).

Accordingly, "subjective complaints may support a finding of disability only where

objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r

of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d

1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the

severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all

---

3. The undersigned notes that both parties reference *both* SSR 16-3p, 2016 WL 1119029 and SSR 96-7p, 1996 WL 374186. The former supersedes the latter, however, its effective date in March 2016 post-dates the ALJ's January 2016 decision. Neither party directly addresses the issue of whether SSR 16-p should be applied retroactively. District courts within this Circuit have disagreed regarding the retroactivity of SSR 16-3p and the Sixth Circuit has not decided the issue.

Those courts applying SSR 16-3p retroactively have relied on the fact that SSR 16-3p's purpose was clarification, rather than change. *See, e.g., Sypolt v. Berryhill*, 2017 WL 1169706, at n.4 (N.D. Ohio) (applying SSR 16-3p retroactively). Those courts declining to apply SSR 16-3p retroactively have relied upon prior Sixth Circuit statements regarding retroactivity in social security cases. *See, e.g., Murphy v. Comm'r of Soc. Sec.*, 2016 WL 2901746, at n. 6 (E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively) (citing, *inter alia, Cruse v Comm'r of Soc. Sec.*, 502 F.3d 532, 541-42 (6th Cir. 2007) ("We are not aware of any constitutional or statutory requirement that the Administration apply its [newly effective] policy interpretation rulings to appeals then-pending in federal courts, absent, of course, ex post factor or due process concerns not present here."); *Combs v. Comm'r Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) ("The [Social Security] Act does not generally give the SSA the power to promulgate retroactive regulations.")).

The Sixth Circuit, while declining to reach the retroactivity issue, has characterized SSR 16–3p as merely eliminating "the use of the word 'credibility' . . . to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016). The undersigned finds it unnecessary to decide this issue, as it is "largely academic here" *Goddard v. Berryhill*, 2017 WL 2190661, at *20 (N.D. Ohio). Both SSR 16-3p and 96-7p refer to the two-step process described above, and the factors listed in 20 C.F.R § 404.1529(c). As discussed below, the ALJ evaluated Plaintiff's complaints of pain against the evidence of record and did not discount them based on a character judgment. In any event, the Court's evaluation of Plaintiff's credibility argument herein would be the same applying either SSR 16-3p or SSR 96-7p.

of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully supported, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x. 508, 511 (6th Cir. 2013) (citation omitted).

Here, the ALJ appropriately explained the two-step process for evaluating symptoms. (Tr. 21) (citing 20 C.F.R. § 404.1529). He then summarized Plaintiff's testimony, and followed that two-step process. First, he determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 21). The ALJ summarized Plaintiff's testimony and noted that "[h]e testified that he can stand for approximately 45 minutes and can walk approximately one-eighth of a mile before needing to rest." *Id.* The ALJ then stated that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* The ALJ provided several reasons for this finding. Contrary to Plaintiff's assertion, the ALJ appropriately considered whether

Plaintiff's statements regarding his symptoms were consistent with other evidence, including objective medical evidence.

First, ALJ considered Plaintiff's daily activities in accordance with 20 C.F.R. § 404.1529(c)(3)(i). Plaintiff "testified that he remains able to perform many daily activities that are consistent with basic work functions, including cooking, cleaning and caring for his mother." (Tr. 23). *See* Tr. 35-36 (Plaintiff's testimony that care of his mother includes "making sure she has what she needs, if there's any shopping or anything, and making sure she's all right" as well as "a lot of running around for her, help with . . . doing laundry, cooking, cleaning, stuff like that"); *Walters*, 127 F.3d at 532 ("An ALJ may consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.").

Second, the ALJ appropriately considered treatment and measures used to relieve pain, in accordance with 20 C.F.R. § 404.1529(c)(3)(iv). The ALJ noted Plaintiff had "participated in physical therapy" and "uses a TENS unit, which decreased his symptoms and allowed him to stand for longer periods." (Tr. 22) (citing Tr. 547, 628).[4] Additionally, the ALJ referenced Plaintiff's medial branch block injections and lumbar radiofrequency rhizotomies. (Tr. 21-22). Notably, the record indicates Plaintiff received some pain relief from these procedures. *See* Tr. 780 (Plaintiff reported his first medial branch block had provided him relief for a month and a half); Tr. 831 (Dr. Tabbaa's notes that Plaintiff's medial branch blocks had "lasted for 1-2 months"); Tr. 887 (January 2014 note from left side rhizotomy that "RT side was done 2 weeks ago and feeling better"); Tr. 408 (Dr. Sieben's July 2014 note that Plaintiff reported he had "very good relief" from the rhizotomy and requested referral back to Dr. Tabbaa); Tr. 429 (Dr. Tabbaa's note 10 days after a

---

4. The undersigned recognizes that these references pre-date Plaintiff's alleged onset date. However, Plaintiff also testified at the time of the hearing that he had a TENS unit. (Tr. 40). Regardless, this was not the only evidence the ALJ considered.

left side rhizotomy that "[l]eft side is feeling great"); Tr. 364 (Dr. Darr's note that Plaintiff reported the rhizotomy procedure helped his lower back pain); *see also* Tr. 39-40 (Plaintiff's testimony that injections and rhizotomy procedures provided him relief for four to six months).

Contrary to Plaintiff's assertion, the ALJ also considered the objective medical evidence in the record. The ALJ pointed out that while Plaintiff's physical examinations "at times identify tenderness over his paraspinal muscles or positive straight leg tests", they were "otherwise normal with normal range of motion [and] normal extremities[.]" (Tr. 22). This is supported by the evidence of record. (Tr. 446) (Dr. Tabbaa's September 2014 findings of tenderness to palpation over paraspinal muscles, but normal strength, reflexes, and sensation in all extremities); Tr. 509 (Dr. Suntala's April 2015  examination showing normal range of motion and no tenderness in Plaintiff's back); Tr. 977 (Dr. Suntala's July 2015 finding of a positive straight leg raising test, but no tenderness); Tr. 367 (Dr. Darr's March 2014 findings of no spine tenderness, normal straight leg test in sitting and supine position, and full strength in extremities).

The ALJ also summarized the findings of Dr. Darr's consultative examination, which concluded Plaintiff was less limited than he alleged. *See* Tr. 22-23. On examination, Dr. Darr found Plaintiff had a normal gait, appeared comfortable sitting and laying down, had no tenderness in his spine, and negative straight leg raise tests. (Tr. 22) (citing Tr. 364-71). Dr. Darr also found Plaintiff had normal range of motion, except for somewhat reduced range of motion in his knees. (Tr. 371). Overall, this examination revealed Plaintiff to be less limited than he alleged.

Moreover, the ALJ also noted a contradiction in the record regarding the reason Plaintiff stopped working: "The claimant's allegations that his impairments prevent him from performing any work are not supported by the record evidence. The claimant testified that he stopped working because he was terminated from his job, not because his impairments prevented him from

23

working." (Tr. 23). *See* Tr. 35 (Plaintiff's testimony that he was terminated for not showing up for work, but that the schedule had been changed and he was not notified). When asked what happened on September 13, 2013 to render him disabled, Plaintiff responded "Well, that was the day I was terminated from the House of Blues. The, the problems had started a little bit before that." (Tr. 34).

Plaintiff argues the ALJ failed to consider relevant x-rays in the record, as well as Plaintiff's treatment with pain relievers, a cane, a TENS unit, and a knee brace. (Doc. 15, at 14). A review of the ALJ's decision reveals he did not ignore such evidence. He referenced Plaintiff's back x-rays (Tr. 21) (citing Tr. 550), knee x-rays (Tr. 22) (citing Tr. 362), and use of a TENS unit (Tr. 22) (citing Tr. 547, 628). The ALJ, however, considered these x-ray findings in light of the record as a whole and reasonably concluded they did not reveal Plaintiff was as limited as he claimed. *See, e.g., McKenzie v. Comm'r of Soc. Sec.*, 2000 WL 687680, at *5 (6th Cir.) ("[T]he mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual."); *Young v. Sec'y of Health & Hum. Servs.*, 925 F.2d 146 (6th Cir. 1990). And, as discussed above, although the ALJ must "consider" the listed factors, there is no requirement that the ALJ discuss every factor. *White*, 572 F.3d at 287; *Roberts*, 2010 WL 2342492, at *11. The undersigned finds the ALJ did not err in failing to further discuss the evidence cited by Plaintiff.

These reasons provided by the ALJ explicitly address several of the factors to be considered in evaluating a claimant's subjective complaints of pain, including Plaintiff's daily activities, and treatment to relieve pain. *See* 20 C.F.R. § 404.1529(c). Taken as a whole, the ALJ's decision determining Plaintiff's subjective symptom reports were contradicted in part by the record is

24

supported by substantial evidence in the record and the ALJ sufficiently explained the reasoning behind his evaluation of Plaintiff's subjective symptom reports.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is not supported by substantial evidence, and therefore remands the decision pursuant to Sentence Four of 42 U.S.C. § 405(g) for proper consideration and explanation of the weight given to treating physician Dr. Sieben's opinion.


 s/James R. Knepp II
United States Magistrate Judge